2024 IL App (1st) 230645-U

SECOND DIVISION
August 16, 2024

No. 1-23-0645

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18CR15692 |
| | ) | |
| MICHAEL FENNER, | ) | Honorable |
| | ) | Michael J. Kane, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) the State proved defendant guilty of resisting or obstructing a peace officer beyond a reasonable doubt; (2) defendant's fourth amendment rights were not violated and the trial court did not err in excluding this argument; (3) the trial court did not abuse its discretion in admitting evidence of a prior incident at a car lot because such evidence was not hearsay; and (4) the trial court did not abuse its discretion in sentencing defendant to an 18-month term of probation.

¶ 2    Following a jury trial, defendant Michael Fenner was convicted of two counts of resisting or obstructing a peace officer proximately causing injury and subsequently was sentenced to 18 months of probation. On appeal, defendant argues that: (1) the State failed to prove that the officers were engaged in authorized act at the time of the arrest beyond a reasonable doubt; (2)

the trial court erred in excluding evidence and argument that the police violated his fourth amendment rights when he was arrested in his home without a warrant; (3) the trial court erred in allowing the State to present hearsay and improper other crimes evidence that defendant had struck the owner of a car lot; and (4) defendant's sentence is excessive, constitutes a trial tax, and the trial court relied on improper aggravating factors.

¶ 3    Defendant was arrested on October 8, 2018, and subsequently charged by information with multiple counts of aggravated battery, aggravated assault, and resisting or obstructing a peace officer proximately causing injury. Prior to trial, the State informed the court that it was proceeding on four counts: aggravated battery for kicking and pushing Officer Vincent Barner (Counts I and IV respectively); resisting or obstructing a peace officer, and proximately causing an injury, against Officer Barner (Count VII) and Sergeant Tiffany Washington[1] (Count IX). The remaining counts were nol-prossed. The State made a pretrial plea offer to defendant for a reduced charge of resisting or obstructing a peace officer, a Class A misdemeanor, in exchange for the State recommending a sentence of time served and a dismissal of all charges. Defendant declined the plea offer.

¶ 4    In its motion *in limine*, the State moved for "the defense [to] be precluded from arguing that defendant's 4th /14th Amendment rights were violated as no motion was filed in the above entitled case regarding violations of defendant's constitutional rights," which the court granted over defendant's objection. In his motion *in limine*, defendant asked that the State not be permitted to elicit testimony regarding the alleged battery that occurred at a car lot in October 2018. The charges from the instant case arose while the officers were investigating the alleged

---

[1] Sergeant Washington was a police officer when the events occurred, but testified at trial that she was then a sergeant. We will refer to her by her more recent rank for consistency.

battery and defendant asserted that the testimony would be prejudicial and portray him as a violent person. The court held that it would allow the evidence to show the reason behind the officers' actions but the evidence would not be admitted to show propensity. Defendant also objected to the admission of the audio from the police worn body camera footage as inadmissible hearsay. The trial court reviewed the video recording and overruled defendant's objection.

¶ 5 Defendant was initially tried by a jury on these charges in September 2022 which resulted in a not guilty verdict of aggravated battery based on kicking Officer Barner (Count I). The jury was unable to reach a verdict on the remaining counts. The trial court entered judgment on the not guilty verdict on that charge and declared a mistrial on the other counts.

¶ 6 Defendant's second jury trial began on February 15, 2023. The State offered defendant to plead guilty to a misdemeanor resisting or obstructing peace officer charge in exchange for a recommended sentence of time served. Defendant again declined the offer. The parties also reasserted their motions *in limine,* and the court reaffirmed its previous rulings.

¶ 7 The following evidence was presented at the second trial.

¶ 8 Sergeant Tiffany Washington testified that she has been employed by the Chicago Police Department for 11 years and at the time of defendant's trial, she held the rank of sergeant. At the time of the incident, she was a field training officer. In that capacity, she was one of the officers who would train new officers "in order to show them what needs to be done, to explain to them the different laws, the different techniques." On October 8, 2018, she was training Officer Sandra Alvarez while on morning patrol. They were in uniform and driving a marked squad car. The sergeant received a call to go to the 9000 block of South Ashland Avenue due to a disturbance at a car lot. There, she was informed that a man kept coming into the establishment and threatening the employees of the car lot. Sergeant Washington was told by the owner that the man struck him

in the face. After being given a description of the individual and a copy of his driver's license, she then proceeded to the 9400 block of South Justine Street, which was approximately five blocks away. She also contacted Officer Barner for support.

¶ 9     At the residence, Sergeant Washington and Officer Alvarez stood on the steps to defendant's porch. They first made contact with defendant's wife when she answered the door. Sergeant Washington asked to speak with defendant. Sergeant Washington identified defendant in court as the "subject in the blackish, grayish jacket." Defendant stood at the front door with the door open. Sergeant Washington spoke with defendant at the top of the porch with Officer Alvarez across from her and down a step, and Officer Barner at the bottom of the steps on the sidewalk path leading to the porch. When defendant opened the door, she informed him that the complaining witness had made a battery report alleging that defendant had struck him in the face. Defendant responded and denied striking the man. Defendant told the officers to come inside his house, but Sergeant Washington declined and told defendant to refrain from going to that car lot again. Defendant responded that "he didn't care what we said; if he didn't get his money by 12 o'clock, there was gonna be a problem." Defendant "became highly combative," telling the officers that "he didn't care what [they] said," and he "kept making the threat to go back" to the car lot. Sergeant Washington considered defendant's statement a threat. At that point, Officer Barner came up the porch steps and defendant "retreated back into the residence and started making threats."

¶ 10     As defendant went back into the house, the officers followed him. Officer Barner "asked [defendant] to place his hands behind his back." Defendant "turn[ed] with his hands up on the wall like he [was] about to let Officer Barner search him, push[ed] off the wall, then [ran] into the kitchen, screaming, [g]et out my house, you don't have any business being in my house."

4

¶ 11    Officer Barner attempted to "de-escalate the situation," telling defendant to "stop resisting," which defendant "wasn't having at all." Sergeant Washington believed defendant threw "something at Officer Barner," went into a stairwell, and swung "a closed fist" at Office Barner's face but did not make contact. Officer Barner was telling defendant not to hit him. Sergeant Washington was standing beside them in the stairwell. Defendant "kept swinging" at Officer Barner, spit at him, and tried to kick him. The last time defendant swung at Officer Barner; Sergeant Washington grabbed defendant's left hand with her right hand. Defendant then pulled away and twisted Sergeant Washington's wrist, causing her pain. While the officers waited for backup, defendant continued refusing to comply and shouting that they were "going to have to kill him to get him out the house, he's not going, he wants his F-ing money. He just kept being belligerent, kept going off, would not listen to anyone's commands whatsoever."

¶ 12    When the backup officers arrived, Sergeant Washington backed up and moved to the top of the stairwell. As the officers were attempting to turn defendant around to prevent him from swinging at them, she observed Officer Barner fall down two to three steps while defendant was struggling. After the officers were able to place defendant in handcuffs, Sergeant Washington was transported to the hospital for treatment of her wrist. She received an ice pack and pain medication, but she did not miss any work for the injury.

¶ 13    Sergeant Washington was equipped with a body-worn camera, and it was activated during the events of that day. She explained that the camera has a "30-second buffer" of video recorded without audio prior to an officer activating the camera. Once activated, the camera will record audio and video. When the State asked to admit the camera footage, defense counsel stated, "Judge, we don't have any problem with admitting it." The State then played Sergeant Washington's camera recording for the jury.

¶ 14    Sergeant Tiffany Washington's body-worn camera footage shows her standing on defendant's porch with Officer Alvarez standing a couple of steps down. From Sergeant Washington's perspective, Officer Barner is seen approaching from the street and walking onto the property. As explained in her testimony, the first 30 seconds of the footage does not have audio. The audio begins as defendant opens the front door. Sergeant Washington then turns to a closed front door which defendant opened shortly thereafter and spoke with the officers. Sergeant Washington stated that defendant went to the dealership and hit someone in the face. Defendant told her that he did not hit anyone. He went to the dealer to get his money back because they sold him a car with the motor "blown." Washington informed him that the dealer made a report on defendant. Defendant repeated that he wanted his money back. Sergeant Washington told defendant that he needed to go through the Better Business Bureau. Defendant then said that he "don't need the neighbors in my business so if y'all coming in, come in." Sergeant Washington responded that she was letting him know that the report had been made. When Officer Barner approached the house, he asked Sergeant Washington what the report was for, and she responded a battery and the dealer said defendant "hit him in the face." Defendant said he "did not touch that man" but he was arguing with "that man." Sergeant Washington told defendant that the dealer said, "he had cameras" and defendant again denied striking the dealer and "I told him I want my money back. Period." Sergeant Washington again told defendant that he needed "to go through the proper channels" and he cannot keep going there. Defendant then said, "If I don't get my money back by 12 o'clock, there's going to be a problem. And I mean it."

¶ 15    At that point, Officer Barner came onto the porch and told defendant to turn around. Defendant asserted that this was private property and he retreated into his house followed by Officer Barner and Sergeant Washington. Defendant continued to walk through multiple rooms

and told the officers to leave his house. Defendant walked through his kitchen while saying that he could say what he wanted, and it was private property. He started to go down a staircase with Officer Barner following and the two men engaged in a struggle. Officer Barner repeatedly tells defendant not to hit him and to calm down. Defendant continues to argue with the police and exclaimed, "If you don't got a warrant, you ain't got no business in my house." He then started to physically struggle with Officer Barner. Defendant said, "You gonna have to kill me" to arrest me. Additional officers then entered the stairwell and defendant again began a physical struggle. Defendant again said the officers would have to kill him. Officer Barner was below defendant on the stairs when the struggle started. Multiple officers continue to tell defendant to stop resisting.

¶ 16    Officer Vincent Barner testified that he has been a police officer with the Chicago Police Department for 28 years. He explained that his uniform includes a body-worn camera. An officer activates the camera by pushing the button twice, but the camera is always on. In his experience, the body-worn camera may not capture the full incident if the individual is "super close" to the camera.

¶ 17    On October 8, 2018, Officer Barner was on duty by himself in a marked patrol car and was in uniform. At approximately 10:20 a.m., he was directed to the 9400 block of South Justine Street in Chicago to the home of an alleged battery offender. He received a request for support from Sergeant Washington, who was responding to that address. When he arrived on the scene, Officer Barner observed defendant on the porch speaking with Sergeant Washington and a female trainee police officer. He stood at the bottom of the steps and listened to the conversation between defendant and Sergeant Washington. Sergeant Washington explained why the officers were there and defendant responded what he had done and what would happen if he did not receive his money back. Based on his training and experience, Officer Barner considered

7

defendant's statement to be a threat and explained, "It was considered a threat when he said that he was going to go back up there, if he didn't get his money back by 12 o'clock, it was going to be -- he was going to go back up there and it was going to be a problem." After hearing what he considered to be a threat, Officer Barner decided to make an arrest.

¶ 18 Officer Barner then approached and told defendant to turn around. Defendant reacted by moving back into the house and saying that he was not going to be placed under arrest. Officer Barner continued to give defendant directions to stop and turn around to be placed in handcuffs. He followed defendant into defendant's house. Defendant "continued to yell obscenities and saying that he wasn't gonna be placed under arrest."  Officer Barner "attempted" to gain control of defendant, but defendant pushed him and continued moving into the house. Officer Barner followed defendant from the living room into the dining room and continued to instruct defendant to turn around and be handcuffed. Defendant at one point turned around but then pushed Officer Barner again and ran into the kitchen. Officer Barner followed and continued ordering defendant to stop and calm down; defendant refused. Officer Barner confirmed with Sergeant Washington that the complaining witness was going to sign the complaints and then called for backup.

¶ 19 While in the kitchen, Officer Barner was "pleading for [defendant] to stop being aggressive," and defendant "swiped something off the counter" at Officer Barner and defendant attempted to flee down the basement stairs. While in the kitchen, Officer Barner asked Sergeant Washington for confirmation that the car lot owner "was willing to sign complaints," which she confirmed. He also then called for backup officers. Officer Barner tried to grab defendant to stop him from getting all the way to the basement because he was concerned about potential weapons in the basement. While on the stairs to the basement, he grabbed defendant's arms and waist.

Sergeant Washington was also assisting, but Officer Barner was focused on defendant. While Officer Barner "begged for [defendant] to calm down," defendant "kept threatening" and telling Officer Barner that he would "have to kill" him in order to arrest him. Officer Barner responded that they were not going to kill him and he "kept trying to tell him to calm down and not to make this situation worse than what it has to be." Defendant attempted to hit Officer Barner several times, but Officer Barner blocked the blows.

¶ 20    When the assisting officers arrived, Officer Barner shifted his position from face to face with defendant to below defendant on the lower portion of the basement stairs. Defendant reacted to the additional officers by kicking, fighting, and biting. Everyone "went to the ground" and Officer Barner attempted to hold defendant's legs to keep control as the other officers placed the handcuffs on defendant. When defendant was kicking, Officer Barner fell down a few steps and felt "a burning sensation in the back" of his left leg. After defendant was placed in handcuffs, Officer Barner was taken by ambulance to a hospital, where he was treated for bruising and a torn hamstring. Officer Barner's leg was bandaged, he had to use crutches, and was unable to work for three months.

¶ 21    The State introduced photographic exhibits showing Officer Barner dressed in uniform that day and his bandaged knee. When the State asked the court to enter the camera footage into evidence, the court asked if there was any objection and defense counsel answered, "No." The State then played Officer Barner's body worn camera video of the incident.

¶ 22    That video shows the front entrance to defendant's home with five steps leading to the porch landing. From Officer Barner's perspective facing the porch, the porch is on the front of the house on the right side and runs from a little to the left of the door to the right edge of the house. It does not run the full width of the home. The camera shows defendant standing on the

porch landing with the door open and defendant speaking with Sergeant Washington and another female officer two to three steps down. His camera video displays a similar recording of the incident as Sergeant Washington's video recording. Officer Barner testified that he activated his camera as he entered the house, so the beginning of the recording does not have sound until approximately 30 seconds into the video. It shows the officer's perspective as he approached the house and defendant retreating into the house. During the confrontation in the stairwell, both Officer Barner and Sergeant Washinton held and lowered defendant's arm as they told him to calm down and relax. The struggle continued down the stairs. Officer Barner continued to tell defendant to stop resisting and give the officers his hand. Officer Barner stated multiple times that he hurt his leg.

¶ 23    Following the officers' testimony, the State rested. Defendant moved for a directed verdict, which the trial court denied. Defendant rested his case without presenting any additional evidence.

¶ 24    After closing arguments, the trial court instructed the jury, and the jury began its deliberations. Following deliberations, the jury found defendant guilty of two counts of resisting or obstructing a peace officer and proximately causing an injury and not guilty of aggravated battery.

¶ 25    In March 2023, defendant filed a motion for a new trial raising multiple claims, including that the trial court erred in allowing hearsay evidence of the alleged battery at the car lot, the hearsay evidence from the police body-worn cameras, and barring evidence and argument that the police lacked an arrest warrant and other fourth amendment claims. The trial court denied defendant's motion.

¶ 26 At sentencing, the parties presented arguments in aggravation and mitigation. In aggravation, the State detailed defendant's criminal history of four misdemeanors, including two for domestic battery, and a 1992 felony conviction for delivery of a controlled substance. The State requested a sentence of incarceration. In mitigation, defendant argued that the most recent misdemeanor was from 2003, he did not "pick up" a new case while on bond, and he was 47 years old, married with children and grandchildren. Defendant asked for a sentence of probation. The trial court sentenced defendant to 18 months of probation, a $2500 fine, and five days of the Sheriff's Work Alternative Program (SWAP), which was considered served based on defendant's pretrial time in custody. Defendant filed a motion to reconsider his sentence as excessive, which the trial court denied.

¶ 27 This appeal follows.

¶ 28 Defendant first argues that the State failed to prove defendant guilty beyond a reasonable doubt of resisting or obstructing a peace officer proximately causing injury. Specifically, defendant contends that the State failed to establish that the officers were engaged in an "authorized act" when they arrested him inside his home without a warrant. The State maintains that the evidence was sufficient to show that the officers were engaged in an authorized act while arresting defendant.

¶ 29 When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier

of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id.* The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Wright*, 2017 IL 119561, ¶ 70.

¶ 30     Here, defendant was charged with resisting or obstructing a peace officer that proximately caused injury by failing to comply with Officer Barner's and Sergeant Washington's attempts to place him under arrest. To establish the offense, the State must prove the following elements: (1) the defendant knowingly resisted or obstructed a peace officer, (2) the peace officer was performing an authorized act in his or her official capacity, and (3) the defendant knew the officer was a peace officer. *People v. Baskerville*, 2012 IL 111056, ¶ 32; 720 ILCS 5/31-1(a) (West 2016). A person who is convicted of resisting a peace officer and whose resistance was the proximate cause of "injury" to the officer commits a Class 4 felony. 720 ILCS 5/31-1(a-7) (West 2016). Defendant contests whether the State sufficiently proved that the officers were performing an "authorized act" when they entered his residence to place him under arrest. According to defendant, the arrest was presumptively unreasonable because the officers did not have a warrant to arrest him in violation of the fourth amendment. U.S. Const., amend. IV.

¶ 31     Despite defendant's argument to the contrary, the supreme court has held that section 31-

1 of the Criminal Code of 2012 (the Code) is read together with section 7-7 of the Code (*People v. Locken*, 59 Ill. 2d 459, 464-65 (1974)), which provides that a defendant is not authorized to use force to resist an arrest by a peace officer, even if he believes the arrest is unlawful and the arrest is in fact unlawful. (720 ILCS 5/7-7 (West 2016)). "It appears that the legislature, by adopting section 7-7, intended that the making of an unlawful arrest is to be considered an 'authorized act' for purposes of section 31-1. Consequently, resistance of even an unlawful arrest by a [peace] officer is a violation of section 31-1." *Locken*, 59 Ill. 2d at 464-65; *People v. Villareal*, 152 Ill. 2d 368, 374-77 (1992) (following *Locken* to hold that the officer's entry into the house to arrest a third party was an "authorized act" under section 31-1). These provisions ordinarily override a claim of defense of dwelling because they specifically pertain to the use of force in an arrest situation. *City of Champaign v. Torres*, 214 Ill. 2d 234, 243 (2005). "Where the authorized act is an arrest, the inquiry usually ends because a defendant is not privileged to resist even an unlawful arrest." *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11 (citing *Torres,* 214 Ill. 2d at 241-42).

¶ 32     The evidence established that the officers went to defendant's house following the complaint of a battery committed by defendant at the car lot. Sergeant Washington informed defendant of that complaint by the owner of the car lot and told defendant to refrain from returning to that location. Defendant eventually stated, "If I don't get my money back by 12 o'clock, there's going to be a problem. And I mean it." Both Sergeant Washington and Officer Barner, based on their training and the battery allegation, interpreted defendant's statement as a threat and Officer Barner approached defendant to make an arrest. He told defendant to turn around to be handcuffed. At that point, instead of complying with the officer's request, defendant retreated into his house and declared that he would not be arrested. The officers followed

defendant into the house to effectuate the arrest. Defendant continued to refuse to comply with the officers' commands which culminated in a physical struggle in his stairwell. During that confrontation, both Sergeant Washington and Officer Barner were injured.

¶ 33    Based on the supreme court's holding in *Locken* and section 7-7 of the Code, we find that the officers were engaged in an authorized act when Officer Barner made the decision to place defendant under arrest. The officers entered defendant's home only after defendant resisted Officer Barner's command to turn around to be handcuffed. As section 7-7 provides, it is irrelevant if defendant believed the arrest was unlawful, he was not authorized to use force to resist the arrest. See 720 ILCS 5/7-7 (West 2016). " 'Consequently, resistance of even an unlawful arrest by a known officer' is a violation of [section 31-1]." *Torres*, 214 Ill. 2d at 242 (quoting *Locken*, 59 Ill. 2d at 465).

¶ 34    Defendant fails to discuss section 7-7 and its application to the facts of this case. Rather, he cites multiple cases that are distinguishable on their facts. Defendant relies primarily upon *People v. Gallagher*, 2020 IL App (1st) 150354. There, a police officer observed a vehicle parked in the parking lot of a closed gas station. Because the officer knew the gas station had been burglarized in the past, he pulled up behind the vehicle and turned on his lights to see two people in the car. As the officer approached the vehicle, the defendant started the car and began to make a three-point turn. The officer got the defendant's attention and asked for the defendant's license and proof of insurance. The defendant gave his license and an invalid insurance card to the officer but said his valid insurance card was in the trunk. The officer advised the defendant and the passenger to remain in the vehicle. He called in the defendant's information and learned that there were no outstanding warrants for the defendant.

¶ 35    At some point additional officers pulled up to the scene, but the initial officer had not

called for backup. The initial officer told the defendant to exit the vehicle, which the defendant did, but the defendant started to walk toward the rear of the car. The officer stopped the defendant by grabbing his right arm, but the defendant continued to try to walk away. At that time, the officer told the defendant he was under arrest for obstructing and trespassing. *Id*. ¶¶ 3-13.

¶ 36    The defendant and his girlfriend both testified for the defense. Both testified that the girlfriend had been driving her vehicle when she felt something strange with the tires so she pulled into the gas station to check. The defendant moved to the driver's seat to drive the car to determine the issue. Right after the defendant got into the driver's seat, the officer pulled up behind them. He denied walking to the trunk when the officer ordered him out the car because the officer had said to "forget about" the insurance card. The defendant testified that the officer "slammed" him against the vehicle. *Id*. ¶¶ 15-20. The defendant was subsequently found not guilty of trespass but guilty of resisting or obstructing a peace officer. *Id*. ¶ 22.

¶ 37    On appeal, the defendant argued that the State failed to prove him guilty beyond a reasonable doubt because the evidence failed to prove that the officer "was engaged in an authorized act where his seizure of defendant lacked reasonable articulable suspicion." *Id*. ¶ 27. The reviewing court then considered whether the officer had "a reasonable suspicion to conduct a brief investigative stop, also known as a '*Terry* stop' under *Terry v. Ohio*, 392 U.S. 1 (1968)." *Id*. ¶¶ 31-32. "In *Terry*, the United States Supreme Court held that 'an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere "hunch." ' " *Id*. ¶ 32 (quoting *People v. Gherna*, 203 Ill. 2d 165, 177 (2003), citing *Terry*, 392 U.S. at 27).

¶ 38    The *Gallagher* court concluded that the officer lacked a reasonable suspicion to justify a *Terry* stop, noting that the State failed to present any evidence of the gas station being burglarized, that the officer had not observed the vehicle's occupants engage in any suspicious activity, and the gas station's owner had testified that the air pump remained available for customers to use when the gas station was closed. *Id*. ¶¶ 35-38.

¶ 39    The court generally observed that "[i]f the officer's conduct violated the fourth amendment, it is unauthorized, and the defendant, therefore, is not in violation of section 31-1(a)." *Id*. ¶ 29. Accordingly, the reviewing court held that the State's evidence was insufficient as a matter of law to establish that the officer was engaged in an authorized act. *Id*. ¶ 42. "Specifically, the evidence failed to demonstrate that there was reasonable articulable suspicion present to warrant [the officer's] attempt to effect a *Terry* stop. Accordingly, [the officer's] actions were not authorized, and therefore, defendant was not obstructing an *authorized* act of a police officer." (Emphasis in original.) *Id*.

¶ 40    In contrast, the officers in this case were not making a *Terry* stop, but rather were making an arrest after defendant made a perceived threat towards the owner of the car lot. *Gallagher* is distinguishable for this simple reason alone. Moreover, where a peace officer is not undertaking an arrest, the *Locken* rule is inapplicable. *Torres*, 214 Ill. 2d at 243-44. Thus, the *Locken* rule was not at issue in *Gallagher*, but is determinative in this case. We find other cases cited by defendant to be distinguishable on this basis as well. See *Jones*, 2015 IL App (2d) 130387, ¶ 16 (finding that the officer exceeded his authority to remain on the defendant's porch after the officer observed no violence and the potential victim had no discernible injuries and did not request assistance); *People v. Elliott*, 2022 IL App (2d) 210359-U, ¶ 20 (finding that the police officer's order for the defendant to exit his garage was not an authorized act because the officer

wanted to effectuate a traffic stop for a speeding offense that the officer had witnessed and had no intent to arrest the defendant); *People v. Tatum*, 2024 IL App (3d) 220456-U, ¶¶ 18-20 (finding that the officers lacked a reasonable suspicion to support a *Terry* stop and were not engaged in an authorized act).

¶ 41    Moreover, defendant cites *People v. Givler*, 2022 IL App (3d) 200255-U, for persuasive purposes, but the decision actually supports the State's argument here. In that case, the police received a call about a suspicious person in a Meijer store parking lot. *Id*. ¶ 6. Upon arrival, the officers observed the defendant and confirmed that the complainant wanted the defendant arrested and would sign complaints. When the officers attempted to place the defendant under arrest, he initially complied, but as the officers were trying to place the defendant's second wrist in handcuffs, he pulled his elbow away and tried to walk away. The officers took him to the ground and placed him under arrest. *Id*. ¶¶ 7, 10.

¶ 42    On appeal, the defendant argued that the State failed to satisfy its burden to prove that the officer named in the complaint engaged in any "authorized" act because the underlying reason for the arrest, a disorderly conduct charge, was dismissed and not discussed at trial. *Id*. ¶ 18. The reviewing court observed that "[p]hysical acts of resistance support a resisting a peace officer charge, even when the underlying charge is unwarranted." *Id*. ¶ 19 (citing *People v. Thompson*, 2012 IL App (3d) 100188, ¶ 13). The court found that the officer's testimony explained why he and another officer believed they had probable cause to arrest the defendant. After the officer initiated the arrest, defendant resisted by pulling his arm away and attempting to move away from the officers and his "actions forced the officers to wrestle defendant to the ground to effectuate the arrest." *Id*. ¶ 20. The *Givler* court held that the evidence proved beyond a reasonable doubt that the defendant resisted a peace officer and the "fact that the charge

defendant was arrested for, disorderly conduct, was eventually dismissed is immaterial." *Id*.

¶ 43    We find *Givler* persuasive to support our finding that the State proved beyond a reasonable doubt that the officers were engaged in an authorized act. Similar to the facts in *Givler*, the officers in the present case came to defendant's residence after a report of a battery had been made. The officers informed defendant of the report and when the defendant made a comment that the officers perceived as a threat, Officer Barner initiated an arrest. Defendant's resistance forced the officers to enter his home and engage in a physical struggle to effectuate the arrest.

¶ 44    Thus, under the *Locken* rule, the State presented evidence to show the officers' actions to place defendant under arrest were authorized acts. See *Locken*, 59 Ill. 2d at 465. After reviewing the evidence in the light most favorable to the State, we conclude that sufficient evidence was presented such that a rational trier of fact could find the officers were engaged in an authorized act beyond a reasonable doubt and we affirm defendant's convictions for resisting or obstructing a peace officer causing injury.

¶ 45    Next, defendant contends that the trial court erred in granting the State's motion *in limine* which prevented defendant from presenting evidence that a violation of his fourth amendment rights occurred. According to defendant, the court's ruling violated his due process rights by denying him a fair trial and his right to present a complete defense. The State initially asserts that defendant has forfeited this claim by failing to argue before the trial court that the court's ruling violated his due process rights or any other constitutional violation.

¶ 46    In criminal cases, the supreme court "has held consistently that a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 11.

18

In his motion for a new trial, defendant asserted that the trial court "erred in granting the State's *motion in limine* to bar the introduction of evidence that CPD Officers did not have an arrest warrant or a search warrant, and/or may have committed Fourth Amendment violations." Elsewhere in his posttrial motion, defendant contended that he was denied due process and a fair trial under the United States Constitution and the Illinois Constitution. Since he raised the issue in his posttrial motion, we find defendant sufficiently preserved this issue on appeal.

¶ 47    Nonetheless, defendant's claim fails on the merits. "The decision to grant or deny a motion *in limine* rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of discretion." *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 34. An abuse of discretion is only found where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 48    As thoroughly discussed in our analysis above, the officers were engaged in an authorized act when they sought to place him under arrest. The making of an unlawful arrest is considered an 'authorized act' for purposes of section 31-1. *Locken*, 59 Ill. 2d at 465. As previously observed, section 7-7 of the Code provides, "A person is not authorized to use force to resist an arrest which he knows is being made either by a peace officer or by a private person summoned and directed by a peace officer to make the arrest, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." 720 ILCS 5/7-7 (West 2016). Thus, it is irrelevant whether the underlying charge had merit or if defendant believed the arrest was unlawful. See *Torres*, 214 Ill. 2d at 242 (citing *Locken*, 59 Ill. 2d at 465); see *Villareal*, 152 Ill. 2d at 374-75. Resistance of an unlawful arrest by a peace officer is a violation of section 31-1. *Id.* "Where the authorized act is an arrest, the inquiry usually ends because a defendant is not privileged to resist

even an unlawful arrest." *Jones*, 2015 IL App (2d) 130387, ¶ 11. Since defendant was not authorized to use force to resist an arrest and the supreme court has consistently held that effectuating an arrest is an authorized act, defendant's fourth amendment claim lacks merit and the trial court correctly barred any argument on this basis. Accordingly, the trial court did not abuse its discretion in granting the State's motion *in limine*.

¶ 49    Defendant next asserts that the trial court erred in allowing inadmissible hearsay statements and other crimes evidence regarding the allegations that defendant struck the owner of the car lot. According to defendant, statements about the alleged battery at the car lot were improperly admitted through both officers' testimony and in the footage from the body worn cameras. Specifically, defendant contends that these statements were substantive out-of-court comments and were not limited to the course of the officers' investigation. He also argues this evidence was admitted as other crimes evidence to show his criminal propensity. The State responds that defendant's claims are either waived, forfeited, and/or lack merit.

¶ 50    Initially, the State contends that the footage from Sergeant Washington's and Officer Barner's body worn cameras was admitted without objection and was affirmatively waived. Prior to trial, defendant argued in a motion *in limine* that the State should be barred from playing any audio from the police body worn cameras based on hearsay, which the trial court denied. During the trial, defense counsel made a standing objection to hearsay statements regarding the testimony related to the alleged battery at the car lot. Defense counsel did not object when the State sought to admit both of the body camera videos. For Officer Barner's body camera video, the trial court asked if there was any objection and defense counsel answered, "no." When the State asked to admit Sergeant Washington's body camera video, defense counsel responded, "Judge, we don't have any problem with admitting it." In his motion for a new trial, defendant

20

argued that the trial court erred in denying his motion *in limine* "to bar the hearsay statements of CPD [Chicago Police Department] Officers in their bodyworn camera audio." He further asserted that the trial court erred in denying his motion *in limine* "to bar the hearsay statements of the car dealer who alleged Defendant punched him, resulting in CPD Officers relocating to Defendant's house."

¶ 51     As previously observed, "a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *Denson*, 2014 IL 116231, ¶ 11; see *People v. Bush*, 2023 IL 128747, ¶ 56.

¶ 52     However, defendant's agreement with the admission of the body camera footage at his trial was counter to his previous position. "[W]hen a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, [he or she] cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332 (2005) (citing *People v. Gaffney*, 205 Ill. 2d 52, 114 (2001), *People v. Payne*, 98 Ill. 2d 45, 50 (1983)). "This is because, by acquiescing in rather than objecting to the admission of allegedly improper evidence, a defendant deprives the State of the opportunity to cure the alleged defect." *Id*. When the State sought to admit both video recordings, defendant acquiesced in their admission and made no objection, which is in direct contradiction to his motion *in limine* and posttrial motion. By acquiescing in the admission of the video recordings, defendant forfeited his ability to challenge this claim on appeal.

¶ 53     Nevertheless, even if defendant's hearsay arguments were not forfeited, we find that none of the statements were inadmissible hearsay for the following reasons.

¶ 54     As discussed above, the decision to grant or deny a motion *in limine* rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of

discretion. *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 34. Additionally, admissibility of evidence is within the discretion of the trial court, and its ruling will not be reversed unless there has been an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion is only found where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *Martinez*, 2021 IL App (1st) 182553, ¶ 34.

¶ 55    Defendant contends that multiple statements from Officer Barner and Sergeant Washington, either in their testimony or in the video from their body cameras, were inadmissible hearsay. He argues that the substance of the officers' statements referring to the alleged battery at the car lot was admitted to prove the truth of the matter asserted, *i.e.*, he struck the car lot owner and was not part of the officers' course of conduct. Specifically, defendant points to Sergeant Washington's testimony that she responded to a call from the car lot and a "worker said that there was a gentleman that kept coming to the establishment threatening them" and later "[t]he owner said the subject struck him in the face." She then went to defendant's home and "informed him that the victim had made a police report against him for battery." Sergeant Washington's body camera showed her telling defendant that the owner "just did a report on" him for "battery," the owner said defendant hit him in the face, and the owner "said he [has] cameras." Similarly, Officer Barner testified that he went to defendant's home because Sergeant Washington had "given [him] information of a battery offender."

¶ 56    Defendant further asserts that the officers' statement that the car lot owner wanted to sign the complaint was also used for the truth of the matter asserted. Officer Barner testified that while inside defendant's house he sought "reassurance" from Sergeant Washington that "the victim was willing to sign complaints." Following an objection by defendant to the term

22

"victim," the prosecutor asked Officer Barner if he confirmed with his partner that "the complaining witness was willing to sign complaints," and the officer responded in the affirmative. The footage from the body worn cameras for both Officer Barner and Sergeant Washington showed Officer Barner ask, "Did he say he wanted a signed complaint?" and Sergeant Washington answered, "Yes," the car lot owner did "say he wanted to file a complaint."

¶ 57    The hearsay rule generally prohibits the introduction of an out-of-court statement used to prove the truth of the matter asserted. *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007); see Ill. R. Evid. 801 (eff. Oct. 15, 2015). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a). "Hearsay statements are excluded from evidence primarily because of the lack of an opportunity to cross-examine the declarant." *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007).

¶ 58    "However, an out-of-court statement that is offered for a purpose other than to prove the matter asserted is not hearsay and does not implicate the confrontation clause." *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25. "[A]n out-of-court statement offered to show the effect on the listener's mind or to show why the listener undertook subsequent actions is not hearsay and is admissible." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 80. "If an assertion is offered to prove that an event it describes occurred or did not occur, it is hearsay; conversely, if offered only for the *fact* that the declarant said those particular words, it clearly is admissible." (Emphasis in original.) *People v. Buffman*, 260 Ill. App. 3d 505, 511 (1994); see also *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 193 (where witness A testifies that "B told me that event X occurred," and A's testimony is offered to establish that B said this, A's testimony is not hearsay).

¶ 59    Thus, "a law enforcement officer may testify about statements made by others, such as

victims or witnesses, when such testimony is offered not to prove the truth of the matter asserted, but instead to show 'the investigative steps taken by the officer leading to the defendant's arrest.' " *People v. Risper*, 2015 IL App (1st) 130993, ¶ 39 (quoting *People v. Pulliam*, 176 Ill. 2d 261, 274 (1997)). "This is not an exception to the hearsay rule; it is a relevant basis for admission of the testimony other than the truth of the matter asserted in those statements and, as such, is not hearsay in the first instance." *Id.* Such testimony is not hearsay because it is based upon the officer's own personal knowledge, and it is admissible although the inference logically to be drawn from it is that the information received motivated the officer's subsequent conduct." *People v. Griffin*, 2022 IL App (1st) 190499, ¶ 42. "The relevance of the testimony lies in explaining to the jury how a law enforcement investigation led to the defendant. Without such testimony, a jury might not understand how an officer got from point A to point C; it might appear to the jury that the officer had less than a valid basis for considering the defendant to be a suspect." *Risper*, 2015 IL App (1st) 130993, ¶ 39. "Testimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *People v. Simms*, 143 Ill. 2d 154, 174 (1991).

¶ 60     Contrary to defendant's contention, the statements at issue were not hearsay because they were not offered for the truth of the matter asserted. Rather, the statements about the alleged battery at the car lot, whether from the officers' testimony or the camera footage, were not admitted to establish that defendant struck the car lot owner. Rather, the statements were used to explain why the officers were at defendant's residence and why the officers perceived defendant's comment to be a threat. This distinction was necessary to understand why the officers sought to place defendant under arrest. Stated another way, the statements were not offered to prove that the incident at the car lot either occurred or did not occur but were admitted

"for the *fact* that the [car lot owner] said those particular words" and were admissible. (Emphasis in original.) *Buffman*, 260 Ill. App. 3d at 511. Sergeant Washington went to defendant's house to inform him of the fact that the car lot owner made a report of the incident. Similarly, Officer Barner went to the location at Sergeant Washington's request based on the report from the car lot owner.

¶ 61    More importantly, defendant's actions following Officer Barner's attempt to place him under arrest were the basis of the case. What the car lot owner told the police or whether he signed the complaint was not used to establish that defendant engaged in the alleged conduct, but rather these statements were relevant to the officers' decision to place defendant under arrest.

¶ 62    Further, the statement made by defendant and disclosed either through the officers' testimony or the camera footage falls within an exception and was admissible. Specifically, defendant complains of his own statement in response to Sergeant Washington telling defendant not to return to the car lot. In her body camera recording, she told defendant that he "can't keep going up there threatening," and in response, defendant said, "If I don't get my money back by 12 o'clock, it's gonna be a problem and I mean that." Both officers testified about defendant's statement and that they perceived the statement to be a threat. However, "[t]he party-admission doctrine is an exception to the hearsay rule." *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 68. Rule 801(d)(2)(A) provides that a statement is not hearsay if "the statement is offered against a party and is (A) the party's own statement." Ill. R. Evid. 801(d)(2)(A). "The statements at issue were all made by the defendant and, so long as they were relevant to the case, could be introduced against him as admissions of a party opponent." *People v. Kidd*, 175 Ill. 2d 1, 29 (1996); see also *People v. Ramsey*, 205 Ill. 2d 287, 294 (2002) (finding the defendant's out of court statement to be admissible as a statement against interest). Such evidence is admissible if it

25

is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *Garcia*, 2017 IL App (1st) 133398, ¶ 68. Relevant evidence has a tendency to make the existence of a fact of consequence more or less probable than without the evidence. *Id.* Under the party-admission rule, defendant's statement was particularly relevant to the case because it formed the basis of defendant's arrest. The officers testified that they perceived defendant's statement to be a threat against the car lot owner and caused Officer Barner to initiate placing defendant under arrest. Thus, defendant's statement fell within the exception to the hearsay rule.

¶ 63     Because we find that the complained-of statements were not hearsay, the trial court did not abuse its discretion in admitting the officers' testimony and the camera footage regarding the car lot incident as well as defendant's statements during his conversation with the officers.

¶ 64     Defendant also asserts that the State improperly relied on the alleged hearsay statements in its closing argument. According to defendant, the prosecutor used the officers' hearsay statements about the alleged battery and the subsequent perceived threat for the truth of the matter asserted. However, no objection was made at trial to this statement and defendant failed to raise this claim in his posttrial motion. To preserve an issue for appellate review, a defendant must both object at trial and present the issue in a written posttrial motion. *People v. Enoch,* 122 Ill. 2d 176, 186 (1988). Since defendant did neither of these, this claim has been forfeited. Further, defendant has not cited or discussed any relevant case law regarding our review of closing arguments. "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Accordingly, defendant has forfeited this argument on this basis as well.

¶ 65     Even if the statements were improperly admitted, we do not consider the error so

prejudicial as to require a new trial. The testimony from both officers regarding defendant's conduct when they sought to place him under arrest, as well as the body camera footage established defendant's actions in resisting arrest and causing injury to both officers. " 'Reversal for improperly admitted hearsay evidence is not warranted where properly admitted evidence proves the same matter.' " *People v. Abram*, 2016 IL App (1st) 132785, ¶ 76 (quoting *People v. Songer*, 229 Ill. App. 3d 901, 906 (1992)). Accordingly, defendant is not entitled to a new trial even if the alleged statements were improper hearsay, which we do not find.

¶ 66    Additionally, defendant contends that the trial court improperly admitted the evidence about the alleged battery at the car lot to show his criminal propensity. The State responds that defendant forfeited this argument because he failed to preserve this claim by raising it in his posttrial motion. In his reply, defendant maintains that he preserved this claim because he argued in his posttrial motion that the court erred in failing to grant a mistrial when the officers referred to the car lot owner as a "victim." However, defendant did not argue that this evidence was improperly admitted to show propensity and this claim has been forfeited. See *Enoch*, 122 Ill. 2d at 186 (To preserve a claim for appeal, a defendant must both object at trial and raise the issue in a posttrial motion).

¶ 67    Forfeiture aside, defendant's claim lacks merit because the trial court explicitly held that it would not admit the evidence for propensity. Prior to defendant's first trial, the court stated that it would not allow the evidence for propensity. The court reaffirmed this ruling before defendant's second trial. Further, the court specifically instructed the jury on the evidence of that alleged battery and that evidence could only be considered for a limited purpose.

> "Evidence will be received that the defendant has been involved in an
> offense other than that charged in the information.

This evidence will be received on the issues of the defendant's lack of mistake and to explain the officer's course of conduct and may be considered by you only for those limited purposes.

It for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issues of lack of mistake and course of conduct."

¶ 68 "We must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict." *People v. Simms*, 192 Ill. 2d 348, 373 (2000). Defendant has not presented any suggestion that the jury disregarded its instructions and considered the evidence to show defendant's criminal propensity. Since the trial court properly declined to admit the evidence to show propensity and instructed the jury on its limited purpose, defendant's claim fails.

¶ 69 Finally, defendant argues that this court should reduce his sentence to time served because (1) his sentence is excessive; (2) it constitutes a trial tax; and (3) the trial court relied on improper aggravating factors. The State responds that defendant's claims are waived, forfeited, or lack merit.

¶ 70 Defendant first asserts that his 18-month sentence of probation is excessive based on his background, including family support, community ties, work history, and the pretrial deprivation of his liberty. Specifically, both at sentencing and before this court, defendant highlights his 23-year marriage, his children and grandchildren, his lifelong Chicago residency and homeownership, and he was employed as a forklift operator. He lost his job while he was detained in jail and was working as a driver for Uber, Door Dash, and related companies. Defendant also argues that he spent over two months in jail from October 8 to December 27,

2018, when his family was unable to post bond. He then spent over four years on pretrial home detention, requiring him to be confined to his home from 7 p.m. to 7 a.m. Defendant contends that under these circumstances, the 18-month term of probation was not warranted after he had already been deprived of his liberty for over four years.

¶ 71    The State first responds that defendant forfeited this claim because his sentencing motion did not include his pretrial detention as a basis for the court to reconsider. Defendant's motion argued that his "sentence is excessive in view of the defendant's background and the nature of his/her participation in the offense." However, "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). The record clearly reflects that defense counsel argued extensively in mitigation about defendant's background, which included his pretrial detention. The trial court considered that in imposing the sentence. Since the posttrial sentencing motion contended that defendant's sentence was excessive in light of his background, which encompassed all points raised by counsel, the trial court had the opportunity to review this claim and defendant has not forfeited his argument.

¶ 72    The State also asserts that defendant affirmatively waived this claim by asking the court to impose a sentence of probation. "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Id.*

¶ 73    In this case, the State asked the court to enter a term of imprisonment and defendant requested a sentence of probation. He did not request a specific term of probation; it was a general request. The court ultimately imposed an 18-month term of probation. In his reply, defendant maintains that his claim has not been waived because he is objecting to the length of the probation, not its imposition, which he asserted in his motion to reconsider sentence, and asks this Court to reduce his term to time served. While defendant did request a term of probation, he did not consent to the length and challenged his sentence before the trial court. We cannot say he affirmatively waived his claim by asking generally for a sentence of probation.

¶ 74    However, regardless of whether defendant waived this claim, we find that it fails on the merits. "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence." *Id*. Accordingly, a trial court's sentencing decision will not be overturned absent an abuse of discretion. *Id*. "The reviewing court may not reverse the sentencing court just because it could have weighed the factors differently." *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 28 (citing *People v. Streit,* 142 Ill. 2d 13, 19 (1991)).

¶ 75    "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Id*. "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 76    Here, defendant was convicted of resisting or obstructing a peace officer that proximately caused injury, a Class 4 felony. See 720 ILCS 5/31-1(a-7) (West 2016). The sentencing range for a Class 4 felony is a term of probation up to three years imprisonment. 730 ILCS 5/5-6-1(a); 5/5-4.5-45(a) (West 2022). Defendant received an 18-month term of probation. This sentence of probation was well within the statutory range for two Class 4 felony convictions.

¶ 77    In its findings, the trial court discussed both the offense and defendant's background at length before imposing the sentence of probation.

"I had two opportunities to evaluate you based on what is in the videos because I sat through the videos. I have seen you in court all the time. You always behave in court. There is no indication to me that you do anything but – you had problems when you were young like a lot of people, you are 48 now. You haven't had any problems in a long time. You are trying to support your family and those are all good things. Frankly, you live in a nice neighborhood with a nice home. I am familiar with that neighborhood. I didn't grow up far from there.

Here is my problem with what happened. I could tell from the videos that the anger that you had against whoever it is that caused you to be investigated by the police was transferred to the police when the police started investigating you. I know you were mad at somebody else about a deal of some sort and I understand that sometimes it happens.

But in a society with rules, the police represent the Executive Branch. When the Executive Branch says you have to do something and you don't want to do it, you bring it to a judge. You don't take on the responsibility of deciding what your rights are on the street. That leads to chaos.

31

And that's what happened here. You were so upset that you were being investigated by somebody who you thought had shorted you or mistreated you as a result of some kind of an automobile deal, and you were making remarks about him or that deal and I heard what you said. That something better happen by a certain time or there was going to be a problem. Those are magical words to the police because if they walk away from that and you execute the plan and nobody gives you what you want, you go back with a gun and kill that guy, somebody is going to be saying, officers, how come you didn't stop that guy? He threatened to do something in front of you and you didn't take any action.

Now you have to put yourself in their spot. The chances are you aren't going to do it. But there is a possibility when you are saying you are going to do it and your body language and your temperament suggest you are going to do it, which is what I saw, then they have a responsibility to say calm down, we will deal with this, let's cool off. And, yeah, maybe we are going take you in for a few hours and let you sit. Then you are going to tell a judge later on, I am not really going to hurt anybody, but I am pretty upset about what happened.

But you let the anger get the best of you. It was apparent on the video how angry you were. But you got to remember just because they wear a uniform, they are human beings. They have families just like you have. They have to support their families. There was really in my opinion no reason for any of this to happen except you were so darn mad.

And one of the officers hurt his knee. I heard the testimony. You got to keep in mind officers have to have certain physical conditions or they can't be

officers any more, which is a problem. And it could have been worse. You could all have fallen down the stairs in those house landed on concrete or something and somebody could have really gotten hurt.

But I will say this, because I did, your lawyers were able to show me exactly what happened. And I am not really sure why this was a no bond case to begin with. Sixty-five days is a lot of days for what was basically a resisting arrest, which got aggravated because the police officers were hurt a little bit. And I am not down playing those injuries; but, at your age, I am not saying you are old, but you are not young. Sixty-five days in jail while you have a job is kind of a lot of time.

Anyway, this is one of those things that should have never happened. You kind of brought it on yourself. They had to do what they needed to do. Two of them were women. Okay.

\*\*\*

I considered the factual basis, the trial evidence, the presentence report, history, character and attitude of the defendant, the evidence, arguments, and statement of allocution presented by the defendant. I considered also the statutory matters which were itemized in the Code. The State's aggravation and mitigation, which has been suggested by counsel for the defendant.

The defendant is hereby sentenced to a period probation of 18 months. He is to be fined \$2,500. He is to do five days' SWAP, which is satisfied by time considered served."

¶ 78    The record clearly shows that the trial court fully considered the evidence in aggravation

33

and mitigation alongside the facts of the case before imposing a sentence it believed was appropriate for the seriousness of the crime. The court recounted how the incident escalated due to defendant's anger over his issues with the car lot and how the police have to consider defendant's statement that if he did not get his money back, there would be a problem. The court considered defendant's age, his history, work and family, and the fact that he was detained for over two months. Defendant's sentence was below the maximum of three years in prison and was in line with defendant's request. While defendant sought a lower period of probation, the trial court entered a sentence within statutory guidelines. Based on our review of the record, we find that the trial court did not abuse its discretion in sentencing defendant to probation for 18 months.

¶ 79     Defendant next argues that his sentence of 18 months' probation constitutes a "trial tax." Specifically, defendant focuses on the State's pretrial plea offer for defendant to plead guilty to a reduced charge of resisting or obstructing a peace officer, a Class A misdemeanor, in exchange for the State's recommended sentence of time served and a dismissal of the remaining charges. Defendant rejected this plea offer multiple times. Ultimately, the jury found him guilty of two Class 4 felonies and he was sentenced to 18 months of probation. Defendant maintains that the disparity between the plea offer, and the sentence creates an inference of an unconstitutional trial tax. The State again responds that defendant waived this claim because he received the sentence he requested. As we previously found, defendant requested a term of probation, but he did not consent to the length and challenged his sentence before the trial court. We cannot say he affirmatively waived his claim by asking generally for a sentence of probation.

¶ 80     The State asserts in the alternative that defendant's claim that his sentence amounts to a trial tax lacks merit. We agree.

¶ 81    A trial court may not penalize a defendant for choosing to exercise his right to stand trial. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. The " 'mere fact that the trial court imposed a greater sentence than was offered during plea negotiations does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for demanding trial.' " *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26 (quoting *People v. Carroll*, 260 Ill. App. 3d 319, 348-49 (1992)). Instead, the record must clearly show that the harsher sentence resulted from defendant's trial demand. *Id*. When the sentencing court makes "explicit remarks" concerning the reason for the harsher sentence, or the sentence is "outrageously higher" than the one offered by the State, it can be evidence of a trial tax. *Id*. In making this determination, we consider the entire record rather than focus on a few statements by the trial court. *Id*. As previously stated, we review the trial court's sentencing decision for an abuse of discretion. *Evans*, 373 Ill. App. 3d at 967.

¶ 82    Defendant relies on *People v. Garcia*, 2023 IL App (1st) 172005, to support his claim. However, we find the facts of that case to be distinguishable from the circumstances in this case. There, the defendant was charged and later convicted of three counts of aggravated criminal sexual assault and one count of aggravated kidnapping, all Class X felonies. *Id*. ¶ 68. Prior to trial, the trial court presided over a plea conference under Supreme Court Rule 402(d) (eff. July 1, 2012). At the conference, the State offered the defendant a term of 40 years in exchange for his plea of guilty on the four counts. The trial court recommended a term of 36 years. The court further explained to the defendant that he could receive a prison term of up to 120 years if he was convicted on all four counts. The defendant rejected the plea bargain offer in favor of trial. *Id*. ¶ 75. The defendant was convicted of all four counts and was subsequently sentenced to 25 years on each count of the four counts, to run consecutively to each other, for a total of 100 years. *Id*.

¶ 45.

¶ 83    On appeal, the defendant argued that his sentence was an unconstitutional trial tax. He asserted that the disparity between the 36-year offer from the court or 40-year offer from the State and his imposed sentence of 100 years penalized him for exercising his right to a trial. *Id*. ¶ 72. The reviewing court observed that the disparity was "exceptionally large, 64 years or 177%." *Id*. ¶ 77. The *Garcia* court could not account for the large disparity based on any facts disclosed at trial that were not presented to the court at the plea conference. *Id*. ¶ 78. The court further could not "account for the extraordinary plea-trial sentencing disparity here solely as an incentive or discount to plead guilty" and pointed out the large disparity was the difference between the defendant leaving prison in his late fifties or spending the rest of his life in prison. *Id*. ¶¶ 79, 85. The *Garcia* court recognized that a "court may impose a sentence following conviction that is greater than what was offered a defendant at a plea-bargaining conference," but held that "under the particular circumstances of this case," the record supported the defendant's claim that he was penalized for exercising his right to trial. *Id*. ¶ 87.

¶ 84    In contrast, the plea offer in this case for the lower Class A misdemeanor in exchange for a recommendation of time served was made by the State. Defendant does not assert that the trial court was actively involved in plea discussions, nor that it offered any sentencing recommendation in exchange for a guilty plea. A Rule 402(d) conference was not conducted. The extent of the court's involvement was to admonish defendant of the consequences of a refusal of a plea offer based on the State's recommendations. Defendant focuses on several comments after hearing the plea offer that defendant would not have to do any additional jail time, could walk out of court a free man, and defendant would not have to report back to the court or a probation officer.

¶ 85    However, the court did not explicitly agree to the sentencing recommendation from the State. The court also admonished defendant that if it "theoretically *** went along with the agreement" to reduce the charge to a Class A misdemeanor, it "could give [defendant] less than a year in jail and that's just potentially." The court further advised defendant that he was facing a potential felony conviction. After rejecting the plea offer and being convicted of two Class 4 felonies, defendant received a sentence of 18 months' probation. According to defendant, this disparity between time served and 18 months of probation "creates the inference of a trial tax." We disagree that a sentence of probation compared to time served on its own infers a trial tax. See *People v. Moore*, 2023 IL App (1st) 211421, ¶ 136 (finding that a sentence three times greater than the State's offer, on its own, does not establish a trial tax).

¶ 86    Moreover, defendant faced a greater sentence going to trial because, as observed, the offer he rejected would have also reduced his charge to a Class A misdemeanor of resisting or obstructing a peace officer. See 720 ILCS 5/31-1(a) (West 2016). The maximum sentence for a Class A misdemeanor is less than one year in prison. See 730 ILCS 5/5-4.5-55(a) (West 2022). Rather than accepting the plea, defendant chose a jury trial on the two charges of resisting or obstructing a peace officer proximately causing injury, Class 4 felonies, with a maximum sentence of three years in prison. See 720 ILCS 5/31-1(a-7) (West 2016); 730 ILCS 5/5-4.5-45(a) (West 2022). He was subsequently convicted of the two Class 4 felonies and his sentence varied from the plea offer for this reason. Our review of the record finds no suggestion that the court imposed the term of probation as a form of a trial tax. As detailed above, the trial court thoroughly discussed the aggravating and mitigating factors considered in imposing the sentence. Accordingly, defendant's claim fails.

¶ 87    Finally, defendant asserts that the trial court relied on improper aggravating factors in

imposing his sentence. Specifically, he argues that the court improperly relied on three aggravating factors: (1) that defendant could have killed the car lot owner; (2) the officers suffered injuries that prevented them from being officers and supporting their families; and (3) that two of the officers on the scene were women. He concedes that defense counsel did not preserve these errors but asks this court to relax with forfeiture rule or, in the alternative, his counsel was ineffective for failing to preserve this claim. We recognize that we may apply principles of forfeiture less rigidly where a defendant challenges a trial court's conduct. *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 57. However, since defendant did not raise this claim in his motion to reconsider his sentence, the trial court was not given the opportunity correct or clarify its remarks. See *id*. Accordingly, we decline to relax the bar of forfeiture, but will review whether defense counsel was ineffective.

¶ 88    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has

ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id*.

¶ 89    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 90    However, we find for the following reasons that defendant's claims of error lack merit and counsel's failure to pursue a meritless claim cannot constitute deficient representation. See *People v. Stoecker*, 2020 IL 124807, ¶ 45.

¶ 91    "[A] trial judge may not consider an improper factor in aggravation when sentencing a defendant because such consideration clearly affects that defendant's fundamental right to liberty." *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18. "When we review a sentence for an alleged error based upon the consideration of an improper factor in aggravation, we consider the record as a whole and do not focus merely on a few words or statements from the trial judge." *Id*. We consider the trial court's statements as a whole because an isolated remark made in passing, even though improper, does not necessarily require that the defendant be resentenced. *Id*. In order to obtain a remand for resentencing, "a defendant who has alleged error must show more than the mere mentioning of the improper factor in aggravation: the defendant bears the burden of showing that the trial judge relied upon the improper factor in fashioning the defendant's sentence." *Id*.

¶ 92    As quoted above, when the trial court's comments are read in context, it is clear that the court did not improperly rely on these alleged aggravating factors in imposing his sentence. First, defendant maintains that the court relied on the fact that he could have killed the car lot owner as an aggravating factor. However, the court did not make a finding that defendant could have killed the car lot owner. When read in context, the court's intention was clear, the court was explaining why defendant's perceived threat had to be taken seriously by the officers. The court also recognized that "chances are" defendant was not going to harm the car lot owner, but defendant's language and temperament suggested the possibility. This was not error.

¶ 93    Second, defendant asserts that the court improperly concluded that the officers suffered injuries that made them unable to be officers and support their families. But the court made no such finding. In context, the court was noting that the officers have families, and their job is physically demanding. Additionally, the evidence established that Officer Barner was unable to work for three months due to the injury to his knee. The court's comments observed the risks of being an officer and that the struggle could have been worse and caused more serious injuries. The court did not suggest that either Officer Barner or Sergeant Washington suffered injuries that ended their career or livelihood. No error occurred in this comment.

¶ 94    Third, defendant contends that the court's observation that two of the officers at the scene were female was improper. Courts have found that the trial court need not disregard the fact that the victim was a female when shaping a sentence. "The gender of the victim is part of the nature and circumstances of the offense." *People v. Helm*, 282 Ill. App. 3d 32, 34 (1996). However, even if this observation was error, defendant has not shown that the court relied upon this single improper comment  in fashioning his sentence. See *Brown*, 2019 IL App (5th) 160329, ¶ 18. Rather, an isolated remark made in passing does not show that the court improperly relied on an

improper aggravating factor. See *id*. When the trial court's findings are read in their entirety and in context, the record does not support defendant's claim. The court detailed the circumstances and its consideration of defendant's history, the nature of the offense, and aggravating and mitigating factors. As the record shows, the trial court did not rely on improper aggravating factors in sentencing defendant. Since there was no error, defendant's counsel could not have been deficient for failing to object to the trial court's comments and defendant's claim of ineffective assistance fails.

¶ 95    Based on the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 96    Affirmed.